Call the case 21-3316, United States v. Jamar Hunter. Mr. Newcomer, whenever you're ready. Good morning, Your Honor. May it please the Court, my name is Matthew Newcomer. I represent the United States as the appellant in this case. Did you have any chance to judge the former Judge Newcomer? I was going to ask the same question. I get that question a lot, Your Honor. No, the short answer. We were both from Lancaster County, where Newcomer is a pretty common name. And I think he had red hair, I'm told. I don't know, but he was a Franklin and Marshall College alum, as I am, Lancaster County. And I have very little hair, red or otherwise. My grandmother lived right next to Franklin and Marshall. And we're not using our chit-chat as any of his time, right? No, of course not. You have to watch Judge McKee that way. Your Honor, is it ready to begin? Whenever you're ready. Thank you. So the sole question here on appeal is whether the district court erred when it held that an electronic, a computerized criminal history check that was performed as part of a traffic stop was not a negligibly burdensome. Let me back you up one step. Did the district court apply the correct matrix here? In other words, should he have viewed this from the objective perspective or the subjective perspective? Well, that's an interesting question, Your Honor. I actually think the framework was incorrect. The framework here is pretty much a per se rule as held in Rodriguez and as affirmed by every circuit court that has interpreted that language since Rodriguez seven years ago. And he asked what time it was. It's a really easy answer to that. It's subjective. It's objective, but I don't think it's even objective, Your Honor, because here it's baked into every traffic stop. Is it one or the other? Here's what's confused me about this, and it's in the facts of this case. And I certainly, through my law clerk's efforts, haven't found anything like it. We know that in the ordinary circumstances, stops require the application of an objective test, correct? Correct. But what happens where, as here, you have the officer, the trooper who made the stop, state explicitly that this records check that he conducted was for the purpose of developing some PC, of developing a case? That's what he said when he testified in the suppression hearing, right? That's the way he testified. So that is an explicit statement of a subjective intention on the part of this officer. I mean, I'm left with that. I'm not entirely sure what standard we're to apply when you have an explicit statement of an officer conducting the stop seeming to inject some subjective implications in what otherwise would be a clearly objective test to be applied. And, Your Honor, I think the answer to that is you don't consider the subjective intent of this specific officer. Even if you know what it is. But why not? And is there a case that says that? The reason that we apply the objective test is you give the police the benefit of the doubt. It's kind of like in a criminal trial reviewing a jury. If any reasonable jury could have been convinced behind reasonable doubt, that's enough. It seems like it's the same situation here. You give police the benefit of the doubt. So if, objectively, there were grounds for the stop or detention, that's enough. But when the officer says, I didn't do this to find out and do anything other than develop evidence of a crime. It wasn't pursuant to safety. None of that stuff. Why would we then apply the objective test when you have evidence of what his own intent was? Well, let me answer that in two phases, Your Honor. One is on the law, and then two, I want to address the facts. So on the law, I mean, this goes back to United States v. Robinson. I think we said it in our brief, 414 U.S. 218, Supreme Court decision from 1973, which specifically held that the traffic violation arrest is not invalidated because the actual motive of the officer might have been something other than officer safety. So if it is a traffic stop, typical traffic stop, right, motor vehicle violations, pulls them over. If the officer's actual subjective intent was, I'm going to check out this vehicle for narcotics trafficking, it still passes. No, no, no. No, it's not if his intent is that. If he states under oath during a hearing that his intention was that. So I don't mean to criticize the trooper for his candor, which it seems he was demonstrating here. But as Judge McKee's question clearly suggested, there is a policy reason that underlies the development and application of the objective test here. But is there a reason for that policy to apply once an officer testifies, as this officer did, that he had other intentions? And I believe it does, Your Honor, because, again, it's still the objective test. United States v. Robinson. It's still the objective test. We're asking you why is it still the objective test, and you're saying, no, because it's the objective test. Because the reasonableness of a search doesn't turn on the officer's subjective intent. In Robinson's Supreme Court, it actually held a permissible post-arrest search is not invalid on the basis that it was not motivated by the officer's safety concern that justified the search. In Robinson, did the officer say he had no safety concern whatsoever, but he was fishing around for evidence? The answer is no. The answer is that. In Robinson, did the officer say that he had absolutely no subjective, no concern whatsoever for anything other than fishing around for evidence? The answer is no. The answer is also no. Did this officer ever say that safety wasn't a concern? He didn't say that. Frankly, Your Honors, the district court, the prosecutor, our office, and the defense, nobody was particularly tuned in to Rodriguez at that initial district court suppression hearing. Nobody asked the officer, does safety play any concern? But he did. He, in fact, said it was. He testified, and this is also something that occurred to me immediately when I read about the stop. It's two against one. This is a single officer making a stop with two occupants. So in the objective test, one would immediately conclude that there's a safety, that there are safety implications to this. He also explicitly says there are safety implications by saying two against one, or two versus one. So that two is consistent with what the objective test would tell us. It's just I take it that like my chambers, you're not aware of any cases either where you have this kind of factual setting with an officer making a statement that is seemingly at odds with what an objective test would be aimed at securing for him. I agree of the uniqueness, Your Honor. But I'm going to push back on the idea that safety wasn't a concern for this particular officer. Officer Clemmons, when asked why he performed the criminal history check, he testified candidly. He was, you know, it was in furtherance of the reasonable suspicion I had that they were drug trafficking. Was that part of the mission of the stop, though? The mission of the stop was to pull over these traffic violations. And then he runs and finds out that he has a valid driver's license and insurance, right? And what Rodriguez and the cases that have interpreted tell us is there are two purposes to every traffic stop. One, the traffic stop itself, right, checking the license, checking the registration, and also to attend to safety-related concerns. Those are equal missions of any traffic stop. And Rodriguez puts a criminal history check in the bucket of reasonable safety precautions that are inherent in every traffic stop. Isn't our problem here that Rodriguez seems to suggest that any prolongation of the stop beyond the mission of the stop, and if we define that mission here as being nothing but undertaking what's necessary to accomplish or effect for purposes of the stop in any violation that the officer had in mind for the stop, that the additional step that was taken, and I would certainly agree, it's minuscule, it's minor, it's short, it is as brief as it can be, really. It's at most a couple minutes that follows directly upon the check the officer made for insurance purposes, for registration purposes. Am I right? Isn't that what the record suggests? Yes, right. That he's done both of these in one return to the patrol car. Right. When he returns the patrol car, he does the license check, the registration check, the warrant check. We're talking about a few other computer entries which take a few more minutes. But what you're getting to, I believe, Your Honor, is that Rodriguez does tell us it's a de minimis rule. So if there's any outside the mission detour. But does that matter, Rodriguez, that it's de minimis? For purposes of this analysis, it doesn't because the safety check, the criminal history check, is part of the stop itself. It doesn't add time to the legitimate stop because it's part of the stop. Just like a registration check, just like a warrant check, Rodriguez doesn't. So are we left with two choices here, really? One is to adopt a rule where, as the facts here suggest, an additional computer check which can objectively be said, and we have subjective testimony to support security concerns, is allowable even in light of Rodriguez. Or that what we have is a situation where the objective test is applicable until there is evidence, in this case, an officer who explicitly testifies, I was doing more than just what was necessary for the traffic stop. I was looking to develop PC for purposes of a drug arrest or drug investigation. I believe it's the former, Your Honor. I'm not aware of any case. Do we have any other? What I'm asking you is do we have any other choices? Yes. Is that what we're left with? There is another choice, Your Honor. It's one I've been trying to advocate, maybe not so well. The other choice is you don't get to the reasonableness or unreasonableness. It's a part of the traffic stop. Let's give you an example. So Pennsylvania Review-MIMS, correct? It allows an officer to order the occupants of a vehicle outside of the vehicle while doing a traffic stop, right? There's no traffic stop motivation for that. It doesn't have to do with a license or registration. It's purely officer safety, right? And that's a bright-line rule that applies in every case. You don't have to get behind the officer's intent. There's no test to say, well, geez, what if he ordered the occupants out of the car because he wanted to check to see if they had the same shoes as a robbery suspect he heard about. It might be the intent. It might not be. But it's a bright-line safety rule that applies in every case. And the Supreme Court has told us it's important to have these bright-line rules in Fourth Amendment cases because the officers that are out there making, you know, split-second decisions in the field during roadside detentions, they can't sit and think, well, geez, you know, I'm going to balance this interest against this interest and make a way analysis. None of that. We need bright-line rules in the Fourth Amendment space so that officers know what they can and can't do. So I understand you to be saying that all of what happened here and any rule that we might craft is subsumed within the reasonableness that is looked to, pursuant to an objective test. I think that's correct, Governor. To make that point a little further, if you look to the cases interpreting Rodriguez in the First Circuit, the Fourth Circuit, the Seventh Circuit, the Eighth Circuit, Ninth, Tenth, and Eleventh pre-Rodriguez, there's no detailed analysis, there's really no analysis of what was in the officer's mind. You don't get to that step here because it's baked into the traffic stop. How many records have what we have here? That's exactly right. This is so different from all of those cases because the officer says, you know, he didn't say I wasn't concerned about my safety. He said the only reason I did it was to see if I could find something on these guys. Well, no, Your Honor. What he said was it developed a reasonable suspicion I had that these folks were involved in narcotics trafficking and therefore might be carrying firearms. Those two things aren't mutually exclusive. It can be developing reasonable suspicion, which he clearly said it was, but the ultimate, if he gets to the reasonable suspicion that he thinks that there's drug trafficking and he testified that he did get there, then he's concerned about safety. So the safety is baked into the concern about narcotics trafficking. It's a really good argument on the record, but that's not, he didn't say that. Well, no, Your Honor. I understand your point was before Rodriguez there's no reason to ask him that on direct. No, nobody asked him that question, but my point is, you know, it's, I don't think it's, I don't think you can assume on this record that safety was not a concern for this officer because, you know, he actually testified. Even without his statement there were two versus one. He doesn't have to say that. Any human being knows, even though this was a daylight stop, that if you've got two occupants in a car that you've stopped and you don't have a partner with you, there's an enhanced safety situation. Correct. But he never called for backup. Even after the second check, he never called for backup. And you'd think that was the reason he was running the check. He said maybe I should get some other folks out here to help me out with this. He never did. Well, again, I mean, we can pick apart individual officers, you know, what he did or what he didn't do. But, again, the test here is the objective test. It's not what officer Clemens did or didn't do. But, Your Honor, I mean, the record doesn't establish conclusively, certainly, that safety was not a concern for this officer. In fact, he testified at 135, obviously the ultimate Terry Frisk, where he finally got, and that was done for officer safety out of concern that the person had a firearm. And that concern is developing all the way up through the stop. That he didn't specifically say safety was a concern to me. He said the concern to me was these guys had drugs. And if that was a concern, then the concern is safety that they might have a gun, you know, So what's the best path forward? Let's assume we agree with you hypothetically that the objective test applies here. Are you asking us to remand this for a second look in the district court or reverse? Your Honor, in our briefs, I believe we ask for a remand. But I think here the facts aren't in dispute. And I think the facts, when viewed objectively, clearly amount to reasonable suspicion for the Terry Frisk. And therefore, you know, I don't see, if the court is comfortable with it, I would suggest a remand for a denial of the motion, I'm sorry, a denial of the motion to suppress and for the case to continue forward from there. That old ancient doctrine of a bird in the hand being worth more than two in the bush. Fair enough, Your Honor. But certainly, you know, and also here, the district court may I'm not going near that. In my part of the country, it's whether or not the bird is edible. I'm not touching that. I got a great reason for that. I'm not going near it. Later on, I'll share it with you. There might be cases when the criminal history itself is kind of, you know, in fact, in many cases, it doesn't really tell you a whole lot, or maybe it doesn't tell you much in terms of officer safety. This isn't one of them. Even Judge Sanchez of the district court on the record said, listen, this is powerful evidence. The driver has, I think, a felony narcotics conviction, an assault conviction, a running from police conviction, and the passenger had three narcotics convictions and a recent gun arrest. On those facts, I think the court said that's powerful evidence. That's powerful evidence that there was something going on here, amounting to reasonable suspicion for the tariff risk. So, you know, whatever the court would be comfortable doing, but I think the record here is sufficiently developed and the law is sufficiently clear to deny the motion to suppress. Thank you. Thank you. Good morning, Mr. Adama. How are you? Good morning, Your Honor. Pleasure. Salvatore Adama on behalf of Mr. Hunter. Your Honor, I believe the district court set the record correct. This is a factual determination. The Rodriguez moment came after the police officer did the traffic stop and did the search of the driver's license. The Rodriguez moment after he ran the license and registration, so to speak, and before he ran the record check. Right, exactly. If he was concerned for his safety, he would have called for backup. Judge Smith pointed out two against one. It's inherently a difficult situation. I assume, gentlemen, that you reviewed the video, the video of the stop. Officer Clements is a big guy, and he described both of these men being very, very nervous and very scared. He described himself as being pretty nervous, too, if I recall. Officer Clements? Yes. Didn't he describe his breathing as he was approaching the vehicle? The defendant you're talking about, right? Yes, exactly. That's what I'm referring to, yes. Right, exactly. He described the defendants being nervous, scared, so that he felt he had the situation under control. He didn't call for backup. Well, he described himself as practicing tactical breathing, and he described himself as practicing tactical breathing, which would suggest he was also nervous. Yeah. Under the circumstances, I can understand that. But when you look at the facts here, he ran a record check. He ran a motor vehicle check. And at that point in time, he had nothing to detain these individuals. You know, the problem with that argument, though, is it seems he had reasonable suspicion before he even went back to the car. When he gets out of the car, I argue that the magistrate judge here, in terms of the high crime court, I think that's an overuse, almost a cliché. It doesn't mean much. I-95, one of the busiest routes in the United States. So the fact he was on or near I-95 on Route 291, which runs right past the airport, the fact that may have been a high crime area, I think that's cute, but that's probably what he learned in the first page of the manual of the academy, to say that. It doesn't mean anything. But what does mean something here, the fact he's nervous doesn't mean anything. Who wouldn't be nervous? Black guy stopped by police. He's going to be nervous. I do. But there are four cell phones in there. It seems to me that the fact there are four cell phones in and of itself gives him reasonable suspicion to go further, maybe to a tourist stop. Forget the traffic stop. He's got grounds for a tourist stop. And as your opponent argued, under Mims, even without the four cell phones, he could order them out of the car. With the four cell phones, he can clearly order them out of a car. So I'm beginning to wonder if he has reasonable suspicion at that point, The fact that there may have been a Rodriguez moment interceding here, such as would under Rodriguez support a suppression of the gun, I'm troubled because you've got reasonable suspicion before the Rodriguez detention happens. Well, we're addressing the four cell phones. It's not uncommon for people to have a business phone and a personal phone. That's true. Well, and there's two individuals. The other factor you referenced was that the passenger was hiding his face with his cell phone, wouldn't make eye contact with him and kept looking straight ahead. He didn't make any furtive movements. He didn't. The passenger decided not to have any contact with the police. Again, intimidated by the police, scared, under control. In other words, the officer had these people under control by his presence as an officer, having a weapon, being a big guy. But he's in when he's in the car. He didn't have them under control. Well, Judge, if he had problems, if he felt that he had concerns for his safety, he could call for backup. I mean, are you are you disputing that he had objectively and subjectively a reasonable concern for his safety under those circumstances? He explained that he didn't have concern for his safety. I'm going by what he testified. No. What he said explicitly was it was two versus one. Those were his language. But he also indicated that he had no concern. What did he say? Please point me to the record. I don't have it in front of me, but he indicated that he had. I think Judge, Judge Sanchez asked him a set of three questions. And the last question, I think, pointed to the fact that he had he wasn't concerned. At what point? Throughout. I believe it was. That's my understanding. That there wasn't a concern for his safety. If there was a concern for his safety, these guys are taught to call for backup. He had local backup. He had local police. And he could call for state police. And he had he had my client and his passenger under control. They weren't going anywhere. He decided he didn't need it. And then he did. His whole purpose was is that he wanted to develop by looking at the records and trying to develop probable cause to make a search. And it wasn't enough. It wasn't totality of circumstances. You look at all these circumstances here that he points to in order to make a pat down search. It's not there. But why not? There's no there's no there's no criminality. Why isn't it there under MIMS? Forget the record check in the war and the license check. Why couldn't you have just gone to the driver's side of the car? Look inside. See what he saw. It's OK. Gentlemen, I'm going to ask you to step outside of the car. Put your hands on the hood and pat them down. Why couldn't you have done that? It's unreasonable. It's unreasonable. Intrusion may be unreasonable, but it's legal. I'm reading from you from the police officer's testimony at page 248 of the suppression hearing. And when asked by Judge Sanchez, what particular factors you rely on? And he says just just the cell phones, the rental car, the signs of nervousness from the driver and the passenger. They were extremely nervous. And that this nervousness was actually escalating. Wouldn't that give him enough? No, no, no, no, no, no, no, no, no. There's nothing there to show that any criminality was afoot. Mr. Newcomer did not. It was just a guess. It was just a hunch on his part. Excuse me. I'm sorry. Mr. Newcomer did not point to the case of U.S. versus Sanford, which is not from the Third Circuit, but it's a Seventh Circuit case. Judge Posner wrote the opinion back in 2015. Interestingly, the number of months after Rodriguez would have come down didn't center on Rodriguez or on a Rodriguez moment. But here's what the unanimous opinion of the Seventh Circuit states. And that is the trooper checked the occupant's criminal histories on the computer in his car, a procedure permissible even without reasonable suspicion. Indeed, a procedure in itself normally reasonable as it takes little time and may reveal outstanding arrest warrants. I recognize this is not Supreme Court authority, but, again, it's an unanimous decision of another circuit in the wake of Rodriguez. Do you – would it be your argument that that should not be the law in the Third Circuit? I agree. It shouldn't be the law in the Third Circuit. In this instance, it was clear that the traffic – that there was nothing to hold these individuals or do a search after you did the initial driver's license registration. There was nothing there. There was absolutely nothing there. There was no furtive movements. There was no – they didn't see any bulges. They didn't see anything of criminality. Then he goes and he runs a record check. Does that give him enough? Excuse me? Does the record check give him enough, coupled with all the other circumstances, to do the pat down? To give him a pat down? Yeah. I mean, you're talking about the driver's license or are you talking about the criminal record? The criminal record check. So he has this information of what he sees in the car. No. And then he goes back and runs the record. Does that give him enough? No. What an intrusion it would be for anyone who has a criminal record, every time he gets stopped by a cop, okay, to get tossed, to get searched. It's very, very arbitrary, okay, simply because someone has a criminal record. They're not doing anything wrong. There was nothing – there was no indicia of crime going on here. Nothing whatsoever. Nothing. Nothing. No warrants, no APBs, okay, no bulges, nothing. As far as the conversation between my client and a police officer, it was cordial. He was very compliant. He was scared to death, okay. He was very nervous. And same thing with the passenger. There was nothing. The police officer had these – or the trooper, excuse me – had these two men under complete control. There was nothing there. And that's why he didn't call for backup. If he felt that there was something wrong, he would have called for backup. He just felt that he was able to control the situation and go ahead and do a pat down search based off of what he had. Which was not sufficient. I think Judge Satcher's also made a ruling. Does the record of the suppression hearing anywhere – and I read the entire hearing, but it's been a number of weeks ago – any questioning, any testimony relative to why the officer did not call for backup? I don't recall reading that. Nothing. Nothing. So why should we pay any attention to that factor? Because – I mean, we have an officer who may have risked his own safety by not calling for backup. So what? Well, it's relevant. For your purposes. It's very relevant. If he had concerns, that's what you do. You're suggesting that as a credibility issue, which was not a finding that the district court made. Respectfully, I think it's an extraordinarily reasonable assumption to make that a police officer has concerns for his safety. Well, if you want to argue pure reasonableness irrespective of what the record explicitly states, then let's return to the objective standard, which is what the government wants us to apply. Or we can stick to the record, which may or may not help. He felt that he had everything under control. And that's why he didn't call for backup. That's the only conclusion I can come from. Because he's a very intelligent young man. Very well schooled. Does having the situation under control – and you've said that before. He had both of these occupants of the car under control. And I just suspect you would have many in law enforcement or experts who were called on behalf of law enforcement who would take issue with whether that was actually having occupants of the car under control. But again, what difference does that make here as to whether or not there was a belief on the part of this officer that there was a personal security issue involved, along with the testimony that he had engaged in this tactical breathing, his explicit testimony that there were two occupants versus me versus one? He testified, Judge, that the whole purpose of doing the criminal background check was trying to develop probable cause. Yes, that's the curiosity and irony and very interesting wrinkle of this case. And he didn't testify that he was concerned for his safety. And he could have, but he didn't. Well, pointing out the fact that he's a lone officer and there are two occupants of the car is not an implicit suggestion that there is some power differential at the scene of this stop. I don't know what is. Respectfully. Respectfully. He's trained. You don't have to say respectfully. We know – well, no, I don't know it's there. I've been doing this for a long time. I appreciate that. He gets a little respect. I have more gray hair than all of you put together. You have more hair than him. Well, not that much, but still. But in any event, it's a habit. I'm sorry. No, no, no. That's all right. I don't want you to waste your time. I lost my – he's – I grew up with these two guys. I know three generations of troopers. I end up knowing a fourth before I retire. Before I come back, I thought you grew up with the two guys in the car. But these guys know how to – these guys are trained. There's a training mechanism that they have. And it's the way in which the troopers are trained to be a road trooper. They think differently. I understand what you're saying. Two on one, approaching two strangers. You would think a normal person would have some apprehension. Yes. Well, yes. As a lawyer, I can't – They think differently, right? If they think differently. So a state trooper thinks differently than a – They're trained. And they're trained differently than a Ridley police officer. Yes. So wouldn't that lead to a subjective analysis of every one of these cases? You've got to go by what he's saying, okay, in this particular case. I'm not saying this is going to be a bright line rule. I'm just saying, what is he saying? He didn't indicate that he had any fear. He indicated that he wanted to develop probable cause. You know, he did the record check to develop PC. And he decided to do a pat down. And Judge Sanchez's rule did also indicate that under totality of circumstances, it's not enough. You know, based off all the indicia that he listed in his testimony. My time's up. Gentlemen, it's been a pleasure. Thank you very much. Pleasure, sir. Your Honor, just briefly on rebuttal. Addressing first Judge McKee's point, I agree completely if it was Your Honor's suggestion that the district court got the totality of circumstances reasonable suspicion test wrong when viewed objectively. In addition to the factors you mentioned, I'll run through them all. There's one that is in the record. The officer didn't specifically mention it, but I think it's highly relevant. It's the fact that when the officer originally approached the vehicle, it made some evasive maneuvers. It went from the right lane to the center lane and then went to the left lane and tried to take a left turn off of 291. The officer testified at Appendix 250, you know, this was an evasive maneuver. You know, first, that's when his antenna first goes up, right? Then you have the three cell phones in the cup holder, which you mentioned that's at Appendix 226. I agree, I understand your point. I-95, very busily traveled road, as is I-291. I wonder who drives it every morning. Many do. The testimony is a little more nuanced than that. It wasn't just that he was driving on it. It's that 291 runs parallel to 95, and so folks try to stay on 291 for as long as possible to avoid the law enforcement detection of 95. And 291 because I'm afraid of I-95. That's what he testified to. But we'll put that factor aside. For different reasons. Yeah. For different reasons. Fair enough. We'll put that factor aside because I don't think it's positive. Then you have the rental car. Rental car for three weeks, not just a couple days, three weeks. And the fact that the car had out-of-state plates, so a rental car with out-of-state plates, three cell phones in the cup holder. I don't know, but most rental cars I've ever rented have out-of-state plates. Whether I rent them here or in Illinois, they almost never seem to have the plates in the car where they're rented. I'm just not sure how helpful that is. I'm not sure you need to get into that kind of detail given, at least to my perspective, the four cell phones. Everything else is kind of makeshift, but the four cell phones. That, in my mind, would be a trigger anyhow. And the four cell phones are displayed. I know Judge Sanchez in his ruling, and I'm not recalling the exact language, but it was in the nature of it's not unusual for individuals to have more than one cell phone. But I think it was referring to ownership and at least possession and use. But here what we have, if I'm correct, is all four are out there and visible to the officer making the stop. Is that right? There's three in the cup holder, which is unusual. And the one next to it. Right. Isn't that what makes it a little bit more of the nuance, what makes the four cell phones a little different from just, well, it's not uncommon for one person to own two tubs? No, it's the location. It's the location and the fact that he was talking on the phone when there's three next to him. It's that it takes it out of the ordinary. And then, of course, the fact he was outnumbered, the appendix of 223, that is a factor also that should be taken into consideration. And just to circle back to the, you know, I don't want to get into a discussion in detail about the officer's subjective intent, because it doesn't matter. But the idea that safety, he wasn't concerned for his safety, is just not consistent with the record. Appendix 229, the prosecutor asked him about, well, what's this heavy breathing I hear? And he's like, I was nervous. You know, he had just learned these passengers had significant criminal histories, which, in his mind, gave him reasonable suspicion that they were trafficking narcotics and may be armed. And he was very nervous. And you can kind of see that nervousness as he approaches the car. Now, again, subjective intent shouldn't matter here, but I want to push back on the idea that this particular officer, you know, was completely devoid of any safety concerns. But I will say, in terms of why didn't he call for backup, again, the reason we focus on the objective test is we don't try to get behind the mind of this particular officer. Whether Officer Clemens was, you know, braver than most or more reckless than most, you know, is beside the point. And furthermore, as I've asked in the question, there's nothing in the record here about the call or lack of a call for backup, right? Correct. There's nothing to do with that issue. So it's not really anything for this panel to consider, right? Correct. Last point, Your Honor, is that you referenced U.S. v. Stanford, post-Rodriguez discussion in the Seventh Circuit. I think we said it in our brief. There's similar case law in the First Circuit, U.S. v. Dion, in the Fourth Circuit, United States v. Hill, in the Eighth Circuit, U.S. v. Salkill. I didn't cite this in the brief, so it's 10F4897, Eighth Circuit, 221. The Ninth Circuit, U.S. v. Hylton, the Tenth Circuit, United States v. Mayville, and, as I mentioned, the Eleventh Circuit hasn't ruled in a published opinion on this post-Rodriguez, but its opinion in United States v. Purcell, also cited in our brief, makes a, you know, sort of ahead of its time, makes this proclamation back in 2001. And that's heavily cited in all these cases. Thank you, Your Honor. Any further questions? Thank you, Your Honor.